Adrian GERRITSEN, Jr., d/b/a Pioneer Realty Company, Appellant (Plaintiff below),

v.

Howard DRANEY, Dell Draney and Ruth Draney, Appellees (Defendants below).

No. 2915.

Supreme Court of Wyoming.

May 3, 1960.

Quentin L. R. Alston, Salt Lake City, Utah and R. Dwight Wallace, Evanston, for appellant.

William S. Edmonds and C. Stuart Brown, Kemmerer, for appellees.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Chief Justice BLUME delivered the opinion of the court.

This is an action to recover commission as a real estate broker. The action was filed on August 28, 1958. The plaintiff, Gerritsen, alleged that he was retained as a broker by the defendants to sell, trade,

exchange and dispose of the equity of the defendants in the Star Valley Meat Packing Company plant and a residence property, both located in the town of Afton, Wyoming; that plaintiff negotiated the sale of the aforesaid property of the defendants upon the terms and conditions suggested and agreed upon by defendants and that a written agreement was entered into, a copy of which was attached; that the purchasers of said property procured by plaintiff were ready, willing and able to complete the purchase of the property upon the terms and conditions fixed and agreed upon in writing by the purchasers and the defendants herein; and that plaintiff performed all the conditions of the contract and employment on his part to be performed. He asked judgment against the defendants for $8,000. The defendants answered, denying substantially all of the allegations of the petition, and further alleged that the contract was too indefinite to be enforceable; that the plaintiff was not a licensed broker in Wyoming; and that if plaintiff procured a purchaser pursuant to any agreement the purchaser was not qualified and was unable to perform any agreement entered into. They further alleged "for another and alternative defense" that the plaintiff misrepresented to the defendants that the Forrest Hotel mentioned in Plaintiff's Exhibit A had an indebtedness against it and was subject to liens and encumbrances not to exceed $60,000; that defendants believed the representations to be true; and that the representations were in error and not true in that instead of $60,000 there were encumbrances against the Forrest Hotel of $90,-000. The case was tried to the court without a jury and at the end of the trial the court found generally in favor of the defendants. From that judgment the plaintiff has appealed, alleging that the judgment is not supported by, and is contrary to, the evidence in the case. The parties will be mentioned herein as in the case below or by name.

On April 15, 1958, defendants listed for sale with plaintiff, a real estate broker, "6 acres w/furnish by seller" for $165,000 in cash, "Price includes home of Howard Draney in Afton, Wyo.", with a further provision "Will Exchange for property of equal value, prefer rental property to our written approval", whatever all this may mean. What is called by plaintiff "an earnest money receipt" and which is designated as a preliminary contract was signed April 13, 1958, by defendants and Lou Kiszak and wife, the latter being the purchasers. This instrument was drawn up in a rather slipshod manner and it is somewhat hard to determine just what the meaning is. It is hardly necessary to set it out. Apparently Lou Kiszak and wife agreed to buy for $165,000 cash the "Star Valley Meat Packing Co. W/home now occupied by Howard Draney" in Afton, Wyoming. The "Buyers are offering $60,000 Equity in Forrest Hotel as down Pmt. Forrest Hotel to be refinanced by new owners." Certain payments to be made by buyers are set out. The property described in the contract was not the property of the sellers. Their property was known as "Draney and Sons." In order to determine what the actual agreement was we must, we think, resort in part at least to the oral testimony herein, all of which was admitted without objection, and we must, according to a well-established rule, accept the testimony most favorable to the defendants.

Briefly the contract was as follows: The defendants agreed to sell the property above mentioned for $165,000 cash and were willing to take as part payment the Forrest Hotel at Nephi, Utah, with encumbrances thereon not to exceed $60,000. There was a first mortgage against the property of $48,000 held by the First Security Bank at Spanish Fork, Utah, which apparently was to be refinanced, the plaintiff himself undertaking to see that the loan was refinanced. Plaintiff did not do so, and in fact it was apparently impossible to refinance it because of the condition of the encumbrances against the property. The parties met in Afton, Wyoming, on May 1, 1958, in order to exchange final papers and for the Kiszaks to take possession of the property

of the defendants at Afton. An abstract of title was submitted to Mr. C. Stuart Brown, an attorney at law. He discovered that the encumbrances against the Forrest Hotel far exceeded the sum of $60,000. Plaintiff, as well as Kiszak, testified that the encumbrances against the Forrest Hotel amounted to $90,000 consisting of three mortgages, taxes due in the sum of about $2,000 and some other liens. One of the witnesses stated that the situation was "in a mess." Counsel for plaintiff seem to take the position that it was the duty of the defendants to clean up this "mess." The trial court, thinking otherwise, apparently held that it was the duty of the Kiszaks and the plaintiff to do so. We agree. Thereafter the defendants refused to deliver their property to the Kiszaks, broke off the negotiations, and refused to pay the plaintiff any commission because it was not earned. Thereupon this action was commenced. It may be well to set out some of the testimony in order to determine what the actual transaction was.

Mr. Howard Draney testified, among other things, as follows:

"Q. What can you tell us with reference to Mr. Gerritsen's testimony that he represented to you that there would only be $60,000.00 against the hotel? A. Mr. Gerritsen said there was an RCF loan for approximately, not to exceed $60,000.00 with the Springville bank and they would just transfer that over to our name and all we would have to do was pay that loan off.

"Q. Pay off the 60 thousand? A. Yes.

"Q. Would you have been willing to take the property shown you if it had only had 60 thousand against it? A. Yes.

"Q. Why didn't you take the property? A. Well, after they came over home to take possession of our property, they had the abstracts on the Forrest Hotel property which was the first time I had ever seen them and Mr. Brown examined it and found that there was well over $60,000 liens against that property.

\* \* \* \* \* \*

"Q. Were you able to negotiate a new loan? A. Mr. Thomas informed us that the property had been in proceedings of receivership for approximately a year and a half and he couldn't, at that time, turn the loan over to us.

"Q. Now, you say Gerritsen told you he needed that to protect him from Kiszak? A. Yes, that was Mr. Kiszak's earnest money contract.

"Q. Was anything said about you being bound under it? A. No, he told us that the contract that we had signed —the contract that we would sign—the final and binding contract, we would get our lawyers together and draw it up and they would supply the deeds and abstract deeds and everything.

"Q. Calling your attention to his representation as to there being only $60,000.00 against the hotel, did you believe those representations? A. Yes.

"Q. Did you rely on them? A. I relied on Mr. Gerritsen's word.

"Q. Would you have signed the contract if you had known there was more than $60,000.00 against the hotel? A. No.

\* \* \* \* \* \*

"Q. Now then, Mr. Kiszak had some testimony to the effect that they discussed the liens when you went down to see the property at Nephi. Did you have any discussion on the liens in Mr. Kiszak's presence? A. The only discussion that was ever made on the liens that Mr. Gerritsen says that they wouldn't exceed $60,000.00 and it was with RFC, the Spanish Fork bank, and they would transfer that contract to our name and it was never mentioned again until we went to the bank.

"Q. You went over to the bank and there you discussed the RFC loan? A. Yes.

"Q. When did you first find out about these additional liens? A. When they come over May 1st to take possession of the plant and Mr. Brown went through the abstract deed.

"Q. Were you willing to turn the plant over to them at that time? A. We didn't turn it over to them.

\* \* \* \* \* \*

"Q. I believe you testified there was no mention made of this additional indebtedness by Kiszaks or anyone else? A. No, no mention.

\* \* \* \* \* \*

" \* \* \* A. Mr. Brown found all these liens against it and suggested to us that we don't sign this contract until their abstracts and liens and things are taken care of so that the property could be refinanced.

\* \* \* \* \* \*

"Q. Was anything said about them removing these encumbrances? A. Oh, yes, when they came over we refused to sign any contract until their encumbrances were brought up to date and we could get it refinanced for not to exceed $60,000.00.

"Q. What do you mean, their encumbrances brought up to date? A. Their abstract—to supply us with an abstract and the loan.

"Q. Now then— A. (Interrupting.) Mr. Gerritsen was going to secure this loan for us all the time.

"Q. As your agent? A. Yes, he says that he would have that loan when we signed that earnest money contract. It was our understanding the RFC loan would be assigned over to us.

"Q. Let me ask you this, Mr. Draney: Was the paramount reason you did not sign that contract the existence of indebtedness in excess of $60,-000.00? A. Yes.

\* \* \* \* \* \*

"[Cross] Q. And you stated, I believe, that your objection was the encumbrances were more than $60,000.-

00, against the property. A. That is right, and Mr. Gerritsen would secure the loan for us.

"Q. Let's go first to the encumbrances, Mr. Draney. When did you first learn that the encumbrances were greater than $60,000.00? A. When they came over the first day of May.

"Q. How did you learn they were more than $60,000.00? A. Mr. Brown went through the abstract deed.

\* \* \* \* \* \*

"Q. You knew there was an agreement to satisfy the $30,000.00 mortgage for about $3,500.00, didn't you?

\* \* \* \* \* \*

"Q. By Mr. Alston: Did you know that there was such an agreement? A. It was mentioned.

"Q. It was discussed in Mr. Brown's office? A. In Mr. Brown's office.

"Q. Was it discussed in Mr. Brown's office to the effect that the existing encumbrance could be satisfied for less than $60,000.00? A. It was discussed about the encumbrances and I don't think there was anything definite that that could be settled for less than $60,000.00.

"Q. If that could be, you would have been willing to go through with the contract? A. Yes.

\* \* \* \* \* \*

"Q. At that time did you apply for a loan through that bank? A. That was the reason Mr. Gerritsen had us go to Spanish Fork to meet with Mr. Thomas, on the loan they had on the Forrest Hotel.

"Q. Did you, in fact, apply for a loan? A. That was the only loan we understood there was on the hotel.

"Q. Did you apply for a loan? A. We asked Mr. Thomas about a loan, if we could take that loan over and Mr. Thomas informed us at that time, and the first time we knew the Forrest Hotel property had been in proceedings

of foreclosure for a year and a half * * *.

* * * * * *

"Q. Was it your contemplation, Mr. Draney, that you would secure financing both on your property in Afton and possibly the Forrest Hotel in Nephi, Utah? A. No, Mr. Gerritsen was going to get the loan for us and he would take care of all that for us. We didn't have to get any loans.

* * * * * *

"Q. Did you actually sign up for any kind of loan on anyplace? A. No, there was no purpose to sign up for a loan. Mr. Gerritsen never found a place for me to sign up for it.

* * * * * *

"Q. Mr. Draney, in Mr. Brown's office didn't you suggest the contract be modified so it be made subject to the refinancing of the Forrest Hotel? Wasn't that suggestion actually made? A. I don't know how I could make a suggestion about refinancing because I didn't know where it could be refinanced.

* * * * * *

"Q. Did he [Mr. Brown] ever tell you what it was, other than what the abstract showed? A. He said it showed in excess of $90,000.00.

* * * * * *

"Q. You think the discussion was dropped until those mortgages could be taken care of? A. Yes.

"Q. Did you ever tell anybody in writing what mortgages should be taken care of? A. I didn't do it. I left that to my lawyer.

* * * * * *

"Q. [direct-recalled] By Mr. Edmonds: Mr. Draney, calling your attention to the provision for $500.00 earnest money in the contract that is a part of the plaintiff's complaint, was that $500.00 ever paid to you? A. No.

* * * * * *

"Q. [cross] In your testimony yesterday reference was made to the refinancing of the obligation against the Forrest Hotel in Nephi, Utah. A. Mr. Gerritsen says that he would take care of the financing and the RFC loan would just be transferred over to us."

Plaintiff himself testified in part as follows:

"Q. Did you tell the Draneys and assure them at that time that the total indebtedness at that time would not exceed $60,000? A. I was assured of that.

"Q. You had been assured of that. A. Yes.

"Q. And having been assured of that, you made that representation to the Draneys, didn't you, in good faith? A. Yes, sir.

"Q. You told the Draneys the total indebtedness was not to exceed $60,000, isn't that true? A. Yes, that is correct."

Counsel for plaintiff state in their brief as follows:

"A third defense by which defendants challenged plaintiff's right to recover was that the amount due and owing on the encumbrances against the Forrest Hotel was purportedly misrepresented. The claimed misrepresentation is that the encumbrances against the Forrest Hotel could be satisfied and discharged for less than $60,000.00. It is not disputed that a representation to this effect was made. What is disputed and challenged is that this was a 'misrepresentation.' In order to be a misrepresentation it must be shown to have been false.

"The fact is that this representation was true. The encumbrances against the Forrest Hotel could have been satisfied and discharged for less than $60,000.00. The burden of proof was on defendants to show that this was not so since they claimed it was a misrepresentation. They failed to meet this burden of proof. The defendants them-

selves personally admitted that they made no inquiries as to the existing balances due and owing on the record encumbrances against the Forrest Hotel. * * *"

We fear that counsel for plaintiff are confusing the facts and the law. The defendants did not undertake to do anything whatever except to convey their property upon the receipt of $165,000 in cash or the equivalent. They agreed to accept the Forrest Hotel provided that the encumbrances thereon did not exceed the sum of $60,000. They were entitled to receive a clear title to the Forrest Hotel (55 Am.Jur. Vendor and Purchaser § 149; 92 C.J.S. Vendor and Purchaser § 183) which in this case meant a title with not more than $60,000 in encumbrances against it. They were not required to accept the hotel when the title was not such as agreed upon by the parties. 92 C.J.S. Vendor and Purchaser §§ 183, 187. Counsel say that the Draneys did not make inquiries as to encumbrances against the property, apparently contending that they should have done so. There is no merit in that. Counsel cite no authority. In the first place the Kiszaks were owners of the Forrest Hotel and had peculiar knowledge of the facts. A reasonable rule in such case would seem to be that the burden of proof was upon them to show the encumbrances were not larger than represented. 31 C.J.S. Evidence § 113. In the second place, the Kiszaks, in so far as the Forrest Hotel was concerned, were the vendors of that property, and, as stated in 92 C.J.S. Vendor and Purchaser § 186, "As a general rule, where nothing to the contrary appears from the contract, the good title to which the purchaser is entitled must be made out by the vendor himself, or by his legal representatives." It was the duty of the Kiszaks to tender, or at least be willing, ready and able to tender, to the defendants the conveyance of the Forrest Hotel with not more than $60,000 in encumbrances against it. The tender is required to be one in conformity with the contract. 92 C.J.S. Vendor and Purchaser §§ 228, 229, 230. If not in such conformity,

it is the same as if no tender is made at all. 92 C.J.S. Vendor and Purchaser § 230, p. 102; Hutchinson v. Coonley, 209 Ill. 437, 70 N.E. 686. That the Kiszaks did not comply with these rules of law is clear from the testimony herein. While the so-called "earnest money contract" states "Forrest Hotel to be refinanced by new owners," the testimony on behalf of the defendants, which does not seem to be denied, is that the plaintiff undertook to see that as a matter of fact the refinancing was to be done by him, that is to say, accomplished on behalf of defendants. We see no inconsistency in that connection with any written agreement. The plaintiff did not accomplish the refinancing of the property so it is difficult to see that he was entitled to any commission. It is true that plaintiff and defendants talked about the payment of the commission and the latter wanted to pay it in installments. But we fail to see the materiality of that when it finally appeared that the Kiszaks were unable to fulfill their part of the contract.

Counsel for plaintiff say that since the defendants claim misrepresentation as to the encumbrances totaling $60,000 against the Forrest Hotel the burden was upon them to show that to be true and that they failed to meet the burden. The representation was not as counsel say. It was, as plaintiff himself testified, that there was not more than $60,000 in encumbrances against the property, not that they could be reduced to that amount. The misrepresentation claimed by the defendants was clearly shown by the plaintiff himself, as well as Kiszak, both of whom testified that instead of encumbrances of $60,000 against the Forrest Hotel there were encumbrances against it of $90,000. While the defendants in part treated the matter as to the encumbrances against the Forrest Hotel as a misrepresentation, it may well be considered, according to another defense, as one of the terms and conditions of the transaction, and the law is well settled that a broker is not entitled to a commission unless he produces a purchaser who is ready, willing and able to comply with the terms and con-

ditions of the principal. 8 Am.Jur. Brokers § 174; 12 C.J.S. Brokers §§ 85, 111 b(b). The trial court had a right to find under the facts herein that no such purchaser was produced.

The burden of counsel's argument is, as above indicated, that the encumbrances against the Forrest Hotel could have been reduced to $60,000. That, as heretofore stated, was not the agreement, but, assuming plaintiff's contention to be correct, let us examine the matter. Counsel for plaintiff rely upon the fact that a mortgage of $30,000 in favor of one Leavitt could have been reduced to $3,500. At the time when the parties met at Afton on May 1, 1958, to close up the transaction, plaintiff had in his possession an agreement dated April 27, 1958, purported to be between Kiszak and Leavitt, giving Kiszak an option for 60 days to pay Leavitt $3,500 for a release of the $30,000 mortgage. The agreement was not witnessed, was not notarized and· was not of record, and objection was made that in order to enforce such contract litigation might be necessary. Waiving that matter, however, the agreement required a payment of $3,500. That payment had not been made so far as the. record shows. Apparently counsel for plaintiff think that such payment should have been made by the defendants but the latter never agreed to do so. In fact, the whole contract contemplated that the defendants were not to make any payments of any kind except such as might ultimately be required to satisfy the $60,000 in encumbrances against the Forrest Hotel. So this agreement between Kiszak and Leavitt fails to show fulfillment of the contract on the part of the Kiszaks. Furthermore, unless the Kiszaks paid the $3,500 above mentioned, the encumbrances would not have been reduced from $90,000 to $60,000.

Without mentioning further details which go to show that the purchaser produced by plaintiff was about the poorest kind of purchaser whom he could have produced, e. g. that Howard Draney was "dunned" for bills owing by Kiszak, we think it clear that the trial court had the right to find in favor of the defendants and the judg-ment herein must be and is affirmed. It is not necessary, we think, to consider any other contentions made in this case, as for instance that the contract is indefinite and defendants did not own any Star Valley Meat Packing Company property. See Annotation, 12 A.L.R.2d 1412.

Affirmed.